**Ex parte Swanda Marie LEWIS.**

No. 2–02–126–CR.

Court of Appeals of Texas,
Fort Worth.

March 10, 2005.

Danny Burns, Fort Worth, for Appellant.

Tim Curry, Crim. Dist. Atty., Charles M. Mallin, Chief Appellate Div., Curtis Jenkins, Jim Hudson, Asst. Dist. Atty's, Tarrant County, Fort Worth, for Appellee.

PANEL B: DAUPHINOT, GARDNER, and WALKER, JJ.

## OPINION ON REMAND

ANNE GARDNER, Justice.

### INTRODUCTION

On January 16, 2003, we issued our opinion reversing the trial court's denial of pretrial habeas relief. Because we concluded that the State's repeated use of Appellant's post-arrest silence constituted impermissible prosecutorial conduct, we held that the trial court abused its discretion in denying Appellant's application for writ of habeas corpus on double jeopardy grounds. We rendered judgment dismissing Appellant's case with prejudice because of the mistrial.

On the State's petition for discretionary review, the Texas Court of Criminal Appeals vacated our opinion and remanded the case to this court for reconsideration in light of its opinion in *Ex parte Peterson*, 117 S.W.3d 804 (Tex.Crim.App.2003). In *Peterson*, the court of criminal appeals clarified "the standards under which the Texas constitutional double jeopardy provision, as explained in *Bauder v. State*, 921 S.W.2d 696 (Tex.Crim.App.1996), prohibits a retrial after the defense successfully requests a mistrial." *Id.* at 807. The parties have rebriefed their arguments in light of the *Peterson* holding, and the case has been resubmitted for consideration under *Peterson*. In her sole point, Appellant argues that the trial court erred in denying her application for writ of habeas corpus alleging double jeopardy because of the State's comment on her silence. Because we hold that the trial court abused its discretion by denying the relief sought in Appellant's application for writ of habeas corpus, we reverse and render.

### FACTUAL AND PROCEDURAL BACKGROUND

Swanda Lewis, Appellant, met and married Kenneth Wiley in 1999. Marital problems quickly developed, and Appellant found out that Wiley had an affair with his ex-wife. Wiley also began disappearing for days at a time, and during one such absence, the Health Department informed Appellant that Wiley had contracted A.I.D.S. As a result of this discovery, Wiley and Appellant sought counseling through the Health Department, and Appellant agreed to continue to have sexual relations with him, so long as he wore a condom. At first Wiley abided by their arrangement; however, in the early morning hours of August 10, 2000, Wiley allegedly raped Appellant without a condom.

The morning after the assault, Wiley left the house. When he came home that afternoon, he and Appellant argued. During

an ensuing fight, Wiley was shot and killed. Appellant was charged with murder, and her trial began in November 2001. The State offered the testimony of a jail house informant; a paramedic, who responded to the 911 call; the responding crime scene officer; the medical examiner; and Wiley's brother, none of whom witnessed Wiley's death. At trial, the medical examiner opined that Wiley died as a result of a contact gunshot wound to the back of his head.[1] During its case-in-chief, the State did not call either the responding officer or the investigating detective to testify, nor did the State attempt to introduce into evidence any statements Appellant had made to these officers.

After the State rested, Appellant took the stand in her own defense. Appellant testified that Wiley had raped her two times and when he came back home that afternoon, they began to argue. Appellant said that Wiley began taking clothes to the car, and she went into the bedroom to ensure that he did not take some clothes that she had just bought him. She said that as she entered the bedroom she saw Wiley's handgun lying on the foot of the bed. Appellant stated that, when she saw the gun, she became afraid so she put the gun in the back of her pants. Appellant testified that as Wiley returned to the house, she noticed the car keys hanging on the wall by the door. She testified that she started walking towards the door to get the keys and when she passed Wiley he grabbed her and pinned her arms down to her sides. She stated Wiley began bouncing her up and down and the gun began to slide down her pants. Appellant said during their struggle her arm got loose and she pointed the gun at Wiley in an attempt to scare him. Appellant then

testified that the gun went off, but she did not intend to pull the trigger.

Appellant called 911 and was placed in the patrol car when officers arrived. On the second day of trial, the State conducted a voir dire examination, outside the presence of the jury, of Officer Matthew Moore, who responded to the scene, and Detective John McCaskill, who interviewed Appellant at the police department. Both officers testified that they had each advised Appellant of her *Miranda* warnings, and both stated that Appellant had provided statements to them. The purpose of the voir dire examination was to show the voluntariness of Appellant's statements. However, the State did not attempt to introduce any of Appellant's statements into evidence. The trial court found on the record that when Appellant was placed in the patrol car she was under arrest and had been advised of her *Miranda* warnings. The trial resumed after the voir dire examination of the officers, with the State continuing its cross-examination of Appellant.

During the course of the trial, on three occasions, the trial court sustained defense counsel's objections that the State was impermissibly commenting on Appellant's post-arrest silence. First, during the State's direct examination of crime scene officer Cheryl Johnson, the prosecutor asked her, "When you met with [Appellant] Swanda Wiley, is that the name that she was giving you then?" Defense counsel objected under article 38.08 of the code of criminal procedure; article 1, section 10 of the Texas Constitution; and the Fifth and Fourteenth Amendments to the United States Constitution, and the trial court sustained the objection. Defense counsel

---

1. During the medical examiner's cross-examination, he testified that the trajectory of the ball from the bullet was "slightly upward and slightly from left to right," and he agreed that the bullet did not go through the entire skull.

did not, however, request a jury instruction or move for a mistrial.

Second, during the State's cross-examination of Appellant, the following exchange occurred:

Q. Did you ever tell the 911 operator [Kenneth Wiley] had been raping [you], he had been attacking [you]?

A. No.

Q. In fact, you never told any law enforcement about the rape?

[DEFENSE]: Objection, Your Honor, as to the violation of 38.08, Article One, Section Ten of the Texas Constitution and the Fifth and Fourteenth Amendments of the United States Constitution.

This time, the trial court sustained Appellant's objection and gave an instruction to disregard, but denied Appellant's motion for mistrial.

On the next morning of trial, the trial court, for a third time, sustained an objection by defense counsel based on the State commenting on Appellant's silence when the prosecutor asked her:

Q. After speaking with [Detective] John McCaskill on August 10th of the year 2000, did you have occasion to learn the next day, on August 11th of the year 2000, John McCaskill wanted to speak with you again?

A. Yes.

Q. And you denied him opportunity to speak—

[DEFENSE]: Objection, Your Honor.... Article 1 Section 10 of the Texas Constitution, Fifth and Fourteenth Amendments of the United States Constitution, Article 38.08 of the Texas Code of Criminal Procedure, for all those reasons, Your Honor, object to that last question.

The trial court sustained the objection, instructed the jury to disregard, and granted Appellant's motion for a mistrial.

Appellant then filed an application for a writ of habeas corpus, claiming that a subsequent trial regarding this offense was barred by double jeopardy provisions. On April 4, 2002, the trial court held a hearing on Appellant's application, with the same judge presiding over the habeas proceeding as had presided over the trial. Appellant offered the trial transcript as evidence and rested. The State offered a bill of exceptions, and the prosecutor took the stand to testify to the basis for the questions he had asked Appellant at trial. The prosecutor testified that his purpose was to "shore her up on prior inconsistent statements" and that he had not been "trying to recklessly, intentionally or knowingly goad the defense to having to move for a mistrial." At the conclusion of the hearing, the trial court denied Appellant's request for habeas relief. Appellant appealed to this court and we reversed and rendered judgment dismissing the case with prejudice. The court of criminal appeals granted the State's petition for review.

Following our decision in *Lewis*, the court of criminal appeals issued its opinion in *Ex parte Peterson*. In *Peterson*, the court of criminal appeals set out the following three-pronged analysis to be employed by courts in analyzing a double jeopardy mistrial claim:

(1) Did manifestly improper prosecutorial misconduct provoke the mistrial?

(2) Was the mistrial required because the prejudice produced from that misconduct could not be cured by an instruction to disregard? And

(3) Did the prosecutor engage in that conduct with the intent to goad the de-

fendant into requesting a mistrial (*Kennedy* standard) or with conscious disregard for a substantial risk that the trial court would be required to declare a mistrial (*Bauder* standard)?

117 S.W.3d at 816–17.

The court of criminal appeals remanded to this court for reconsideration in light of its holding in *Peterson.*

## STANDARD OF REVIEW

■■■ When raising a double jeopardy claim on a pretrial writ of habeas corpus, the applicant bears the burden of proof under a preponderance of the evidence standard. *Id.* at 818. Therefore, Appellant must satisfy all three prongs of the analysis set out above. *Id.* In reviewing the trial court's decision to grant or deny habeas relief, we must review the facts in the light most favorable to the trial judge's ruling and should uphold the decision absent an abuse of discretion. *Id.* at 819. We should afford almost total deference to a trial court's determination of the historical facts that the record supports, especially when the trial court's fact findings are based on an evaluation of credibility and demeanor. *Id.* We also afford that same level of deference to a trial court's ruling on application of law to fact questions, also known as mixed questions of law and fact, if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor. *Id.* But appellate courts review de novo those mixed questions of law and fact that do not depend upon credibility and demeanor. *Id.* Although reviewing courts should also grant deference to "implicit factual findings" that support the trial court's ultimate ruling, they cannot do so if they are unable to determine from the record what the trial court's implied factual findings are. *Id.*

## ANALYSIS

### A. DID MANIFESTLY IMPROPER PROSECUTORIAL MISCONDUCT PROVOKE THE MISTRIAL?

■■■ Conduct is not manifestly improper if it is the result of inadvertence, sloppiness, or even simple negligence. *Id.* at 817. A prosecutor's blunder that precipitates a successful motion for mistrial does not bar a retrial. *Id.* Prosecutorial misconduct reasonably reaches only that conduct which is qualitatively more serious than simple error and connotes an intentional flouting of known rules or laws. *Id.* at 816 n. 55. If the prosecutor's conduct, viewed objectively, was not manifestly improper, then the double jeopardy inquiry ends at this first stage. *Id.* If, for example, the law itself is unsettled or the application of the law in the particular situation is debatable, the prosecutor's conduct cannot be said to be manifestly improper. *Id.*

Appellant argues that this first prong has been satisfied because the prosecutor, on three separate occasions, attempted to comment on Appellant's post-arrest silence. Appellant also points to the trial court's admonition to the prosecutor that his global attempts to impeach Appellant were improper. The State counters that the prosecutor's conduct does not rise to the level of prosecutorial misconduct and should instead be characterized as simple trial error.

■■■ The State, in arguing that the prosecutor's conduct does not rise to the level of prosecutorial misconduct, contends that two of the questions by the prosecutor were not improper comments on Appellant's silence and thus, objections to these questions should not have been sustained. The first occurred during the direct-examination of Officer Johnson when she was asked if Appellant had stated her name was Swanda Wiley. The State argues that

this question did not imply silence, but rather implied that Appellant had given a name to officers.

■ Questioning normally attendant to arrest and custody is not interrogation. *McCambridge v. State*, 712 S.W.2d 499, 505 (Tex.Crim.App.1986). Asking a person his name, address, and telephone number is not interrogation protected by the Fifth Amendment because it is not likely to elicit an incriminating response. *Massie v. State*, 744 S.W.2d 314, 317 (Tex. App.-Dallas 1988, pet. ref'd). Accordingly, the prosecutor's question to Officer Johnson regarding the name provided by Appellant was not an improper comment on her silence. Thus, this question was not objectionable.

■ The second question the State argues was not an impermissible comment on Appellant's silence occurred during cross-examination of Appellant, when she was asked, "In fact, you never told any law enforcement about the rape?" The State argues that Appellant opened the door to questions about what she told the police because she testified on direct-examination that she told detectives "the same thing I'm telling you," which included an allegation that Wiley had raped her. The State contends that the prosecutor's question on cross-examination was a proper inquiry into the fact that she did not tell the police that she had been raped. We disagree.

At the point in the trial when this question was asked, there was no evidence showing that Appellant had made a prior inconsistent statement. Although Appellant admitted on direct examination that she had made a statement to a detective, no statement had yet been admitted into evidence. The prosecutor's first attempt to show inconsistency was with the question, "In fact, you never told any law enforcement about the rape?" As we discuss below, without any evidence that her prior

statement was in fact inconsistent, this question goes directly to Appellant's silence.

■ Absent a showing of actual inconsistency, post-arrest silence is not probative as evidence of prior inconsistent conduct; therefore, impeachment through the use of such evidence is improper. *Sanchez v. State*, 707 S.W.2d 575, 582 (Tex.Crim. App.1986); *see Turner v. State*, 719 S.W.2d 190, 193 (Tex.Crim.App.1986) (holding that it was error to permit State to cross-examine defendant regarding post-arrest silence without first establishing that defendant had made an inconsistent statement). In *Turner*, the court of criminal appeals stated:

> In his cross-examination, the attorney for the State referred to the time following the arrest of the appellant ("while on bond") when he asked the appellant if he had told "any law enforcement officer" about his alibi. The attorney for the State never proved that the appellant made a statement during that time which was actually inconsistent with the alibi he offered as a defense at trial. The trial court erred in permitting the attorney for the State to cross-examine the appellant regarding his post-arrest silence, without first establishing that appellant made an inconsistent statement during that time.

719 S.W.2d at 193 (footnote omitted); *see also Hampton v. State*, 121 S.W.3d 778, 782–84 (Tex.App.-Austin 2003, pet. ref'd) (holding it was error to allow State to use defendant's post-arrest silence against him "by demonstrating to the jury that he had never told the investigating officer or any sheriff's deputy the exculpatory theory he related from the witness stand"); *Veteto v. State*, 8 S.W.3d 805, 813 (Tex.App.-Waco 2000, pet. ref'd) (finding State's inquiry into defendant's post-arrest silence was

improper because State had not established an actual inconsistent position taken by defendant prior to asking about post-arrest silence).

Because the State did not establish an actual inconsistent position between what Appellant testified to at trial and any statement made following her arrest, it was error for the State to attempt impeachment through Appellant's post-arrest silence. Thus, the trial court was correct in sustaining Appellant's objection and instructing the jury to disregard the question.

■ Likewise, the last objected to question, "And you denied him opportunity to speak—" was also an improper question that implicated Appellant's post-arrest silence. In its brief, the State does not attempt to justify this question and readily concedes that it was improper. We must now decide whether the questions precipitating these two properly sustained objections amounted to manifestly improper prosecutorial misconduct.

■ The United States Constitution prohibits the use of a defendant's post-arrest, post-*Miranda* silence for impeachment purposes. *Fletcher v. Weir*, 455 U.S. 603, 607, 102 S.Ct. 1309, 1312, 71 L.Ed.2d 490 (1982). Texas goes further and provides protection against the use of a defendant's post-arrest, pre-*Miranda* silence for impeachment. *Sanchez*, 707 S.W.2d at 582. The court of criminal appeals in *Sanchez* recognized two rationales for this greater protection. *Id.* at 578. First, such use would violate the accused's right to be free from compelled self-incrimination under article I, section 10 of the Texas Constitution. *Id.* Second, rules relating to impeachment prohibit the use of such evidence since post-arrest silence is not probative as prior inconsistent conduct. *Id.*

■ It is a well-established rule that an individual's post-arrest silence may not be used against him at trial. *Lewis v. State*, 933 S.W.2d 172, 182 (Tex.App.-Corpus Christi 1996, pet. ref'd); *see Doyle v. Ohio*, 426 U.S. 610, 619, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976); *Dinkins v. State*, 894 S.W.2d 330, 356 (Tex.Crim. App.), *cert. denied*, 516 U.S. 832, 116 S.Ct. 106, 133 L.Ed.2d 59 (1995); *Cuellar v. State*, 613 S.W.2d 494, 495 (Tex.Crim.App. 1981). Indeed, during the writ hearing, the prosecutor acknowledged that he was "well aware of the governing principles behind the right to remain silent." Yet, he twice impermissibly attempted questions that went directly to Appellant's post-arrest silence. This action resulted in two sustained objections, two curative instructions, a prior motion for mistrial, and finally a declaration of a mistrial.

The law regarding the use of post-arrest silence is not unsettled, nor is the application of the law in this situation debatable. *See Peterson*, 117 S.W.3d at 816 n. 55 (noting that the prosecutor's conduct cannot be manifestly improper if, for example, the law itself is unsettled or the application of the law in the particular situation is debatable). Therefore, based on the record, we conclude that the prosecutor's conduct amounted to more than simple trial error. *Compare Veteto*, 8 S.W.3d at 813 (concluding it was reversible error to deny defendant's motion for mistrial where State had not established an actual inconsistent position and State persistently pursued improper line of questioning after trial court sustained first objection), *with Lewis*, 933 S.W.2d at 182 (refusing to hold prosecutor's action rose to misconduct where prosecutor asked one question regarding defendant's post-arrest silence and did not continue in an impermissible line of questioning after objection and instruction to disregard). Thus, we hold that mani-

festly improper prosecutorial misconduct did provoke the mistrial.

**B. WAS THE MISTRIAL REQUIRED BECAUSE THE PREJUDICE PRODUCED FROM THAT MISCONDUCT COULD NOT BE CURED BY AN INSTRUCTION TO DISREGARD?**

■ In *Peterson*, the court of criminal appeals explained that the proper inquiry is whether Appellant was "required to move for a mistrial because the prosecutor deliberately or recklessly crossed the line between legitimate adversarial gamesmanship and manifestly improper methods that rendered trial before the jury unfair to such a degree that no judicial admonishment could have cured it[.]" 117 S.W.3d at 816 (quoting *Ex parte Bauder*, 974 S.W.2d 729, 732 (Tex.Crim.App.1998)).

■ The asking of an improper question will seldom call for a mistrial because, in most cases, any harm can be cured by an instruction to disregard. *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim.App.1999). A mistrial is required only when the improper question is clearly prejudicial to the defendant and is of such character as to suggest the impossibility of withdrawing the impression produced on the minds of the jurors. *Id.* Potential prejudice resulting from a question concerning post-arrest silence might be cured by an instruction to disregard. *Johnson v. State*, 83 S.W.3d 229, 231 (Tex.App.-Waco 2002, pet. ref'd); *see Dinkins*, 894 S.W.2d at 356; *Waldo v. State*, 746 S.W.2d 750, 754 (Tex.Crim.App.1988). We defer to the trial court's conclusion on whether an instruction to disregard would have cured the problem. *See Bowen v. State*, 131 S.W.3d 505, 509 (Tex.App.-Eastland 2004, pet. ref'd). Moreover, the trial judge is in the unique position of being able to observe the reaction of the jury and gauge the impact of an improper question or argument. *See Ex parte Bruce*, 112 S.W.3d 635, 641 (Tex.App.-Fort Worth 2003, pet. dism'd, untimely filed) (finding that trial judge did not abuse discretion in declaring mistrial because he was in best position to observe reaction of jurors to improper statement during opening argument of defense counsel and could determine if jury would be biased by statement).

■ The effectiveness of a curative instruction is determined on a case-by-case basis. *Johnson*, 83 S.W.3d at 232. Although not specifically adopted as definitive or exhaustive, courts have looked to several factors to determine whether an instruction to disregard cured the prejudicial effect, including: 1) the nature of the error; 2) the persistence of the prosecution in committing the error; 3) the flagrancy of the violation; 4) the particular instruction given; 5) the weight of the incriminating evidence; and 6) the harm to the accused as measured by the severity of sentence. *Waldo*, 746 S.W.2d at 754; *Johnson*, 83 S.W.3d at 232; *Fletcher v. State*, 852 S.W.2d 271, 275 (Tex.App.-Dallas 1993, pet. ref'd). Thus, we will consider these factors in the present case.

### Nature of the Error

Although the nature of the error is not such that an instruction can never cure it, a question infringing on Appellant's constitutionally protected rights is serious in nature. *Johnson*, 83 S.W.3d at 232. However, the court of criminal appeals has stated regarding comment on the failure to testify:

the ... presumption that an instruction [to disregard] generally will not cure comment on failure of the accused to testify ... has been eroded to the point that it applies only to the most blatant examples. Otherwise, the Court has tended to find the instruction to have force. Even where we have found such

comment beyond cure, the Court has nevertheless held it can constitute harmless error in context of the particular case.

*Dinkins,* 894 S.W.2d at 356.

Clearly, the court has found that although a comment on an accused's right to remain silent is serious, the presumption remains that generally, an instruction to disregard is sufficient to cure the error. Furthermore, Appellant's counsel objected before she could answer the question, supporting the presumption that an instruction to disregard would be effective in curing the error. *See Hyett v. State,* 58 S.W.3d 826, 832–33 (Tex.App.-Houston [14th Dist.] 2001, pet. ref'd) (holding that instruction to disregard was effective where witness never answered question regarding defendant's post-arrest silence). Therefore, we hold that this factor weighs in favor of the State.

### Flagrancy and Persistence

In this instance, the prosecutor twice asked Appellant questions that went directly to her failure or refusal to speak to law enforcement. The prosecutor's improper questions received two sustained objections, two instructions to disregard, and one prior denial of a motion for mistrial. Moreover, as the prosecutor himself admitted, he was well aware that the use of post-arrest silence is impermissible, and yet he chose to disregard a prior sustained objection and instruction to disregard in pursuing this impermissible line of questioning. Therefore, we hold that the prosecutor flagrantly and persistently pursued this improper line of questioning. *See Veteto,* 8 S.W.3d at 811 (concluding that the State was persistent and flagrant by inquiring into post-arrest silence on three occasions); *Mendoza v. State,* 959 S.W.2d 321, 324–25 (Tex.App.-Waco 1997, pet. ref'd) (holding that prosecutor persistently and flagrantly pursued post-arrest silence when he ignored the court's first ruling and repeated the question in a different form); *cf. Johnson,* 83 S.W.3d at 232 (holding State was neither persistent nor flagrant when it did not repeat improper question concerning post-arrest silence); *Fletcher,* 852 S.W.2d at 275 (concluding that one question concerning defendant's failure to provide written statement to detective was neither flagrant nor persistent). Thus, these factors weigh in favor of Appellant.

### Particular Instruction Given

In analyzing the particular instruction given, it is necessary to look at each instruction separately. *Veteto,* 8 S.W.3d at 811. After the first objection during Appellant's cross-examination, the trial judge instructed the jury, "You'll disregard the last question by the prosecutor." After the second objection the trial judge instructed the jury, "You—all are instructed to disregard the last statement by counsel regarding the defendant talking to the police." Similar instructions have been held adequate. *See Waldo,* 746 S.W.2d at 755 ("Jury is instructed to disregard the last comment of the witness."); *Johnson,* 83 S.W.3d at 232 ("Ladies and gentlemen, please disregard the last question by the prosecutor."); *Sands v. State,* 64 S.W.3d 488, 492 (Tex.App.-Texarkana 2001, no pet.) ("Ladies and gentlemen, disregard the last question and answer and don't consider it for any purpose."); *Hardin v. State,* 20 S.W.3d 84, 92 (Tex.App.-Texarkana 2000, pet. ref'd) ("The jury is instructed to disregard the question. There is no answer to it. Completely disregard it."). We likewise conclude that the instruction given in this instance was adequate. Thus, this factor weighs in favor of the State.

### Weight of the Incriminating Evidence

Appellant testified that the gun discharged while struggling with Wiley, but she stated she did not intend to pull the trigger and did not know how the gun discharged. On cross-examination, the State had Appellant demonstrate in detail how she and Wiley were positioned during their struggle. While the testimony of this demonstration is somewhat confusing, it suffices to say that it appears the State was attempting to contradict Appellant's version of the events by showing that Wiley's entry wound was inconsistent with Appellant's description of where he was when the gun discharged. In fact, Appellant admitted that she could not explain how the deceased was struck by the bullet based on her demonstration.

Further, Appellant testified that Wiley fell to the floor after being shot, but this was contradicted by the responding EMT who testified that she found the deceased seated on the couch. Additionally, the medical examiner testified that the bullet entered in the back of the victim's head at the base of his skull and the "muzzle was in loose contact with the skin of the back of his head when it was fired." On cross-examination, the medical examiner stated that he could not exclude that the wound could also be consistent with Appellant's version of the events that the gun discharged during a struggle, but that was contingent on meeting the "angle" and "range of fire." However, on redirect, the medical examiner stated the injury was also consistent with the theory that the deceased was already sitting on the sofa when he was shot unsuspectingly in the back of the head.

Therefore, based on the record and the nature of the testimony, we conclude that Appellant's credibility would most likely weigh heavily on the jury's minds when considering her explanation of the events.

Thus, attempts by the State to point out specific instances when she failed to speak or relate a certain fact to law enforcement could have heavily influenced the jury in judging her credibility. Thus, we cannot conclude that the weight of the evidence overcomes the potential prejudice from these improper questions going to Appellant's silence. *See Veteto*, 8 S.W.3d at 812 (concluding that because evidence of defendant's guilt was not overwhelming, the inference to his silence could have been considered by the jury as evidence of his guilt). Thus, this factor weighs in favor of Appellant.

### Harm to the Appellant as Measured by the Severity of Sentence

Because the motion for mistrial was granted, this factor is inapplicable.

### Summary of Factors

After considering each of the above factors, we hold that the flagrancy of the error, the persistence of the prosecutor in attempting to question Appellant regarding her silence, and the potential prejudice on Appellant's credibility in light of the evidence and testimony presented, was such that an instruction to disregard would not have effectively cured the misconduct. Therefore, the mistrial was required.

**C. DID THE PROSECUTOR ENGAGE IN THAT CONDUCT WITH THE INTENT TO GOAD THE DEFENDANT INTO REQUESTING A MISTRIAL OR WITH CONSCIOUS DISREGARD FOR A SUBSTANTIAL RISK THAT THE TRIAL COURT WOULD BE REQUIRED TO DECLARE A MISTRIAL?**

This third prong is the most problematic. *Peterson*, 117 S.W.3d at 817. Trial and appellate courts should focus primarily upon the objective facts and circumstances surrounding the events that led to the mistrial in deciding whether the

prosecutor's alleged misconduct was committed with the requisite intent or recklessness. *Id.* at 818. The court of criminal appeals provided some factors for trial and appellate courts to consider in assessing the prosecutor's *mens rea*, including:

1) Was the misconduct a reaction to abort a trial that was "going badly for the State"? In other words, at the time that the prosecutor acted, did it reasonably appear that the defendant would likely obtain an acquittal?

2) Was the misconduct repeated despite admonitions from the trial court?

3) Did the prosecutor provide a reasonable, "good faith" explanation for the conduct?

4) Was the conduct "clearly erroneous"?

5) Was there a legally or factually plausible basis for the conduct, despite its ultimate impropriety?

6) Were the prosecutor's actions leading up to the mistrial consistent with inadvertence, lack of judgment, or negligence, or were they consistent with intentional or reckless misconduct?

*Id.* at 818–19.

### Was the Trial Going Badly for the State?

The State argues that the prosecutor in this case believed that the case was going well for the State. The State contends that the case was formidable against Appellant because she had multiple motives for murder, including rape, A.I.D.S., and abandonment, she admitted pulling the trigger, and the medical examiner's description of the gunshot wound severely undermined Appellant's version that the shooting occurred during a struggle while Wiley was holding Appellant in a bear hug from behind. The State also points to the testimony of the prosecutor at the writ hearing, where he stated,

I felt this case was extremely strong against this defendant. In no way was I trying to recklessly, intentionally or knowingly goad the defense to having to move for a mistrial because it was the State's position that the case was going extremely well from the day before and the day of, and that the defendant, with all of the evidence that was presented in the case, was guilty up to that point and then it was going to further it through the impeachment via the two officers.

Despite the State's contention that the "case against Appellant was formidable," we believe the record reveals a different story. During its case-in-chief, the State called as witnesses a woman who claimed to have overheard Appellant in jail say she shot her husband, the responding paramedic, the medical examiner, and Wiley's brother, none of whom witnessed Wiley's death. Moreover, the State failed to present the testimony of either the responding officer or the detective, nor did it attempt to introduce the statements made by Appellant to these officers.

Although Appellant did testify, she stated she did not know how the gun discharged during a struggle with the victim. The record demonstrates that the State attempted to contradict Appellant's version of events and Appellant was unable to explain exactly how the victim was shot in the back of the head. Additionally, the medical examiner testified that the gunshot wound could have occurred as Appellant described, but it was also consistent with the theory that someone came up behind the victim as he was sitting on the couch and shot him in the back of the head.

At the time that the mistrial was granted, the State was attempting to impeach Appellant with what the State believed to be inconsistencies between Appellant's trial testimony and statements provided to

law enforcement. Based on the prosecutor's bill of exceptions and testimony at the writ hearing, it appears that the prosecutor realized there was evidence, the statements made to law enforcement, that he should have presented during his case-in-chief. Consequently, the prosecutor was attempting to impeach Appellant in order to have the ability to introduce the statement she provided to Detective McCaskill into evidence through rebuttal. Therefore, it is apparent from the record that the prosecutor believed it was imperative to his case that he be able to bring this prior statement into evidence to dispute Appellant's trial testimony. Thus, given the nature of the evidence introduced by the State at the point the mistrial was granted, we conclude that the case was going badly for the State.

### Misconduct Repeated Despite Admonition?

The State contends that there was only one improper question, as the other two were not objectionable. However, we have concluded that two of the prosecutor's three questions went directly to Appellant's silence and have detailed that the trial court properly sustained two objections and gave two curative instructions to the jury before granting the mistrial. Thus, the misconduct in asking the second improper question was repeated despite the trial court's admonition after the first improper question.

### Reasonable, "Good Faith" Explanation?

The prosecutor testified at the writ hearing regarding his intent in asking his last question, "And you denied him opportunity to speak—":

The subjective intent for doing that was simply for impeachment purposes. Being well aware of the right, Fifth Amendment rights under the State and the Federal Constitution, it was nowhere near the purpose of complying [sic] silence as any evidence of guilt against the defendant. It was shoring her up on prior inconsistent statements.

. . . .

... Over and over again I've stated that it was used ... to elicit an explanation for a prior inconsistent statement. In no way, shape or form was the State trying to imply anything other than the fact that she gave a prior inconsistent statement.

Upon questioning by Appellant's counsel, the following exchange took place:

Q. Reading back to my question, where in the record did she ever say anything at all, make any kind of statement prior to that about his tactics?

A. Nothing from her mouth, no.

Q. Okay. And you did intend to bring out that she said she wasn't going to talk to him because of his tactics?

A. She denied him an opportunity to speak by stating the words I know what tactics you used.

Q. Did you not say that you intended in your own affidavit to bring out that she denied him the opportunity—or told him she wasn't going to talk to him because she knew his tactics?

A. I just quoted, yes, but not in those exact words.

Q. And that was your subjective intent, that was your full intent, was it not, to bring out that she told him she wasn't going to talk to him because of his tactics?

A. She denied him opportunity to speak by stating the words, quote, "I know what tactics you used." Unquote, yes.

. . . .

Q. The words that were stated, you didn't need to bring up her silence, did you?

A. Didn't say anything about silence.

Q. You said you wouldn't talk to him?

A. Denied him an opportunity to speak by stating the words, I know what tactics you use. It is not an impeachment with silence, it is a prior inconsistent statement shoring up what was going on.

In addition to his testimony at the writ hearing, the prosecutor also entered a bill of exceptions into evidence that also explained his rationale for the last question posed to Appellant. It states:

The State will further show, if able to make a part of the court reporter's record, that:

—Detective John McCaskill gave the defendant an opportunity to explain or deny any inconsistencies on 8–11–00, concerning information provided by the defendant on 8–10–00;

—the State would make no references to the arrest of the defendant, nor that she was in custody at the time of the 8–11–00 attempted interview;

—upon being given the opportunity on 8–11–00, the defendant denied the request to speak with Detective John McCaskill by stating, "I know what tactics you use"

We conclude from our review of the record that the prosecutor was intent on bringing before the jury the fact that Appellant had exercised her right to remain silent. Given every opportunity to explain and justify the basis of his last question, the prosecutor consistently and unequivocally pointed to and commented on Appellant's refusal to speak again with Detective McCaskill.

Moreover, we fail to understand the probativeness of the question going to Appellant's denial of Detective McCaskill's request to speak with her. Appellant provided a statement to Detective McCaskill on August 10, 2000 and declined to speak with him on August 11, 2000, allegedly just stating, "I know what tactics you use." However, there is no allegation in the record by Appellant that she was coerced in any manner in providing a statement on August 10. Therefore, other than to allow the State the opportunity to point to the fact that Appellant chose not to speak with the detective, we fail to see any evidentiary value in this possible statement regarding "tactics."

The only relevant statement was provided by Appellant on August 10 when she gave her version of the events to Detective McCaskill and it is this statement that would be used to point to any inconsistencies in Appellant's trial testimony. In fact, the prosecutor stated in his bill of exceptions that he planned on asking Appellant "to explain any inconsistencies as to what she testified to under oath and what she said on [August 10, 2000]." Consequently, we fail to understand the reasoning of the prosecutor in asking Appellant about her refusal to speak on August 11, 2000.

We conclude that the prosecutor's explanation is not reasonable or in "good faith." If the prosecutor wished to impeach Appellant with her prior statement about the detective's "tactics," he did not need to comment on the fact that she "denied him an opportunity to speak." Regardless of how it was phrased, this question went directly to Appellant's assertion of her right to remain silent and, thus, was an improper comment on her post-arrest silence. Moreover, the prosecutor did not offer any explanation for his first improper comment on Appellant's silence. As the prosecutor was admittedly "well aware of

the governing principles behind the right to remain silent," we are unable to understand why he would twice intrude into this constitutionally protected area. *See Johnson,* 83 S.W.3d at 232 ("We have nothing to explain why a prosecutor would depart from the established rules and question a defendant about his post-arrest silence."). Although the prosecutor could undoubtedly impeach Appellant with a prior inconsistent statement, we can think of no logical reason why he would need to comment on the fact that she had declined to speak with law enforcement. Therefore, we must conclude that the prosecutor did not provide a reasonable, "good faith" explanation for his conduct.

### Conduct Clearly Erroneous?

As the constitutional protections provided to an accused's right to remain silent are well established, the prosecutor's questions regarding Appellant's post-arrest silence were clearly erroneous. *See Doyle,* 426 U.S. at 619, 96 S.Ct. at 2245 (holding use of defendant's post-arrest, post-*Miranda* silence for impeachment violated Due Process Clause of Fourteenth Amendment); *Sanchez,* 707 S.W.2d at 582 (holding that a defendant may not be impeached by post-arrest, pre-*Miranda* silence). *But see State v. Lee,* 15 S.W.3d 921, 925–26 (Tex.Crim.App.2000) (holding that prosecutor's comment on defendant's pre-arrest, pre-*Miranda* silence was not clearly erroneous as the prosecutor had a legitimate view of the law, given the fact that this area of the law had not been addressed by the United States Supreme Court or the court of criminal appeals).

### Legally or Factually Plausible Basis for Conduct?

The State contends that the prosecutor did have a plausible basis for his conduct. It argues that the prosecutor was intending to impeach Appellant, but in his haste, the prosecutor trod into the area of commenting on her silence. While it is apparent from the record that the prosecutor was attempting to impeach Appellant with a prior inconsistent statement, no inconsistencies had been shown between her trial testimony and a prior statement, as there was no prior statement in evidence at that point. As we have stated, although the prosecutor undoubtedly could have impeached Appellant with a prior inconsistent statement, there is no plausible reason why he would need to persistently comment on the fact that she had declined to speak to law enforcement. At the point the mistrial was granted, her prior silence was improper impeachment evidence and should never have been commented on. Therefore, we conclude that there was no legally or factually plausible basis for the prosecutor's conduct.

### Prosecutor's Actions Leading Up To Mistrial?

The State claims the prosecutor was negligent in his conduct, but this negligence did not rise to prosecutorial misconduct. Appellant counters that the error was so flagrant, that if not intentional, it "surely was grossly reckless."

Up until the trial court declared a mistrial, the prosecutor, in the face of two properly sustained objections, two curative instructions, and a prior motion for mistrial, repeatedly attempted to use Appellant's silence in an improper manner. As the prosecutor consistently maintained, his desire in asking his last question was to point to the fact that Appellant "denied the request to speak with Detective McCaskill by stating, 'I know what tactics you use.'" Inherent in this question is a comment on Appellant's constitutionally protected right to remain silent. Further, this came after he had clearly infringed on her silence by

his earlier question, "In fact, you never told any law enforcement about the rape?"

"[J]ust as a dog knows the difference between being kicked and being stumbled over, judges can distinguish between intentional or reckless misconduct and inadvertent or negligent mistakes." *Peterson,* 117 S.W.3d at 818. Accordingly, given the prosecutor's admitted familiarity with the constitutional safeguards concerning the use of an accused's post-arrest silence, we conclude that his actions leading up to the mistrial were consistent with intentional or reckless misconduct.

### Summary of Factors

Given our analysis of the above factors relevant to the prosecutor's *mens rea,* we hold that the prosecutor, at the least, engaged in this conduct with conscious disregard for a substantial risk that the trial court would be required to declare a mistrial.

### CONCLUSION

After applying the analysis established in *Peterson,* we hold that the trial court abused its discretion by denying Appellant's application for writ of habeas corpus. Because double jeopardy bars a second prosecution of Appellant for murder, we reverse the order of the trial court and render judgment granting the relief sought in the application for writ of habeas corpus and dismissing the case with prejudice. TEX.R.APP. P. 43.2(c).