IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. PD-0577-05






EX PARTE SWANDA MARIE LEWIS, Applicant


 



ON STATE'S PETITION FOR DISCRETIONARY REVIEW


FROM THE SECOND COURT OF APPEALS


TARRANT COUNTY





 Cochran, J., filed a concurring opinion.


O P I N I O N 



 I join the majority opinion. I write separately to set out additional reasons for
overruling Bauder. (1) And, as the author of the opinion in Ex parte Wheeler, (2) I also fall upon
my sword.

 Swanda Lewis was charged with murdering her husband. During the trial, the
prosecutor asked her, on three separate occasions, whether she had told the 911 operator, the
crime scene officer, or the detective to whom she had given a post-arrest statement, anything
about her trial-time testimony that her husband had raped her immediately before she killed
him. Each time the defense objected, stating that these questions improperly commented on
her post-arrest silence. (3) After the third such question, the trial court granted a defense-requested mistrial. Ms. Lewis then filed an application for a writ of habeas corpus, arguing
that retrial was barred by the Texas constitutional double jeopardy provision under this
Court's decision in Ex parte Bauder. The trial court denied relief, but the court of appeals
held that the trial court abused its discretion in failing to find that the prosecutor's questions
were manifestly improper and were asked "with conscious disregard for a substantial risk that
the trial court would be required to declare a mistrial." (4) The court of appeals held that the
State was prohibited from retrying Ms. Lewis. We granted review to decide, inter alia,
whether to reconsider our decision in Bauder. I join the Court in overruling Bauder.

 First, however, I agree with the majority that the Texas constitutional double-jeopardy
provision does bar retrial when a mistrial is neither a manifest necessity nor consented to or
requested by the defendant. Although the State and several members of this Court have
argued that the double-jeopardy provision of the Texas Constitution provides no protection
in this context, (5) the Presiding Judge's historical inquiry is precisely the type of analysis
necessary to determine the independent content of the Texas Constitution. And I agree with
her conclusion: Although the Texas Constitution does not explicitly address the double-jeopardy consequences of a mistrial, Texas courts have, for well over 100 years, assumed
(and held) that retrial is barred after jeopardy has attached if the jury is discharged without
a manifest necessity unless the defendant consents. (6) 

 The problem with Bauder is that it undertook no historical analysis of the Texas
Constitution. It did not look to the framers' intent, uniquely Texan social, political, legal,
and jurisprudential developments throughout the late nineteenth and twentieth centuries, or
any other factors in concluding that the Texas double-jeopardy provision provides a thicker
shield than the corresponding federal provision. (7) 

 In Bauder, a bare majority of this Court ignored the United States Supreme Court's
lengthy historical analysis of the federal double-jeopardy provision in its Oregon v. Kennedy (8)
decision. The Bauder majority did not find any inaccuracies in the Supreme Court's
recitation of the common-law historical development of the Anglo-American double-jeopardy protection. It did not point to any Texas deviations from that hoary lineage. (9) Quite
the contrary, it expressly stated: 

 The Texas Double Jeopardy Clause, like its federal counterpart, is meant to
restrain the government from subjecting persons accused of crimes to the
mental, emotional, and financial hardship of repeated trials for the same
offense. (10)


 If the purpose is the same, then why would the meaning and application of our
provision differ? What special and unique factors exist in Texas history or even in its current
social and legal milieu that would call for a different constitutional rule under the same
conditions and fact patterns as those set out by the Supreme Court? In Bauder, this Court
pointed to nothing uniquely Texan. Instead, this Court's answer to the Supreme Court's
decision in Kennedy was: We think the highest court in the land is wrong. (11) It was not that
the Bauder court concluded that the Texas and federal double-jeopardy provisions embodied
different purposes or enjoyed a separate historical lineage, it was simply that this Court
disagreed with the specific bright-line that the Supreme Court drew. So it drew its own
double-jeopardy line in the sand and called it the Texas constitutional line. 

 Indeed, this Court does have the authority to draw such constitutional lines. It is not
the power to draw new constitutional lines that is at issue, it is the "oughtness" of such an
endeavor. At the Alamo, Colonel Travis drew a line in the sand, and his men had a 
choice-step over it or stand pat. When this Court draws new lines in the constitutional sand,
the citizens of Texas have no choice-they must step over it. Their only recourse is to have
the legislature propose a constitutional amendment for the citizens' approval at a statewide
election to erase that new line upon which they were never consulted. 

 One member of the U.S. Supreme Court, Justice Jackson, famously said, "We are not
final because we are infallible, but we are infallible only because we are final." (12) Perhaps
because that Court recognizes that its word on constitutional issues is the final one in
America, it is appropriately deferential to the other branches of government, recognizing that
"[w]e sit as judges, not as legislators[.]" (13) The Supreme Court may, at times, intentionally
draw its constitutional lines parsimoniously to leave the citizens of the various states free to
make their own choices on whether to draw a different line. (14) Justice Brandeis, noting that the Supreme Court sets the floor on constitutional rights and obligations, urged local
experimentation with social and economic reforms: "It is one of the happy incidents of the
federal system that a single courageous State, may, if its citizens choose, serve as a
laboratory; and try novel social and economic experiments without risk to the rest of the
country." (15) Justice Brandeis's emphasis was upon the right of the citizens to choose, not the
power of state judges to choose for them.

 In Kennedy, the Supreme Court recognized that its prior precedent lacked "crystal
clarity" and could be read to grant broader protection in the mistrial context than did the
"bright-line" rule it adopted in Kennedy itself. (16) It adopted the rule that double jeopardy
would bar a second trial after a mistrial "[o]nly where the governmental conduct in question
is intended to 'goad' the defendant into moving for a mistrial" precisely because its prior
pronouncements (and the rule sought by Justice Stevens in his concurring opinion) were
essentially "standardless" and thus would offer little practical guidance to the lower courts. (17)

 Indeed, that has been precisely the problem with Bauder. It followed the rationale of
Justice Stevens' concurring opinion which the Kennedy majority criticized as "amorphous," (18)
and has led to precisely the type of judicial clarifications and re-clarifications that the
Supreme Court predicted would occur without a clear, simple "black letter law." (19) The
Kennedy rule may not be Platonically perfect, but it does have the virtues of clarity and
simplicity. It provides notice and certainty to the bench and bar on how to apply that rule. 
It ensures that similarly-situated defendants will be treated the same. It constrains judicial
discretion. It avoids complicated tests and idiosyncratic judicial balancing factors.

 Because Texas courts have dealt with Bauder for ten years and this Court has clarified
and reclarified it several times, (20) stare decisis might counsel against jettisoning it now. It is
said, in defense of stare decisis, that sometimes "it is better to be consistent than right." (21) 
But Bauder is neither consistent nor right. Stare decisis most frequently does and should
apply to "black letter law," the type of holding that has, among its main virtues, historical
familiarity, ease of application, long-standing reliance, predictability, and precision.

 As the Supreme Court stated in Payne v. Tennessee, "Stare decisis is not an
inexorable command," rather "it is a principle of policy." (22) That policy is least applicable
in constitutional adjudication, because "'correction through legislative action is practically
impossible'" in those cases. (23) In Payne, the Supreme Court overruled its relatively recent
precedent which judicially created a constitutional prohibition against the admissibility of
victim impact evidence in a capital sentencing hearing. (24) It noted that its original holdings
in Booth v. Maryland (25) and South Carolina v. Gathers (26) 

 were decided by the narrowest of margins, over spirited dissents challenging
the basic underpinnings of those decisions. They have been questioned by
Members of the Supreme Court in later decisions and have defied consistent
application by the lower courts. (27) 


The same is true of Bauder, and we appropriately overrule Bauder for precisely the same
reasons that the Supreme Court overruled Booth and Gathers.

 With these comments, I join the Court's opinion.

Filed: January 10, 2007

Publish 
1. Ex parte Bauder, 921 S.W.2d 696 (Tex. Crim. App. 1996).
2. 203 S.W.3d 371 (Tex. Crim. App. 2006). Ex parte Wheeler was this Court's most
recent attempt to reclarify Bauder, and, having written it, I am reluctant to disavow that newly-minted precedent so quickly. But as the discerning reader will have already noted, both Wheeler
and Ex parte Peterson, 117 S.W.3d 804 (Tex. Crim. App. 2003), were "split the difference"
decisions which attempted to steer a middle course between the "harsh" but clear Kennedy rule
and the "kinder, gentler" but ambiguous Bauder rule. Unfortunately, creating a "workable" state
constitutional rule is not a jurisprudentially acceptable substitute for a principled rule. Mea
culpa.
3. The issue of whether this line of questioning was improper is not directly before us.
4. Ex parte Lewis, 165 S.W.3d 376, 392 (Tex. App.-Fort Worth 2005).
5. State's Brief at 10-14, 25-32; Bauder, 921 S.W.2d at 706 n.5 (McCormick, P.J.,
dissenting); State v. Lee, 15 S.W.3d 921, 928-29 (Tex. Crim. App. 2000) (Keasler, J.,
dissenting); Peterson, 117 S.W.3d at 826-27 (Hervey, J., dissenting).
6. See supra, slip op. at 18-27; see also Rutan v. Republican Party of Ill., 497 U.S. 62
(1990), in which dissenting Justice Scalia stated that when a practice not expressly prohibited by the text of the Bill of Rights bears the
endorsement of a long tradition of open, widespread, and unchallenged use that
dates back to the beginning of the Republic, we have no proper basis for striking it
down. Such a venerable and accepted tradition is not to be laid on the examining
table and scrutinized for its conformity to some abstract principle of First
Amendment adjudication devised by this Court. To the contrary, such traditions
are themselves the stuff out of which the Court's principles are to be formed. They
are, in these uncertain areas, the very points of reference by which the legitimacy
or illegitimacy of other practices is to be figured out.

Id. at 95-96 (Scalia, J., dissenting).
7. See Cobb v. State, 85 S.W.3d 258, 266-68 (Tex. Crim. App. 2002) (rejecting the
defendant's argument that Texas courts should adopt a Supreme Court dissent as the expression
of the content of the Texas Constitution). As we stated in Cobb,

 Appellant points to nothing unique in Texas history, law, or jurisprudence which
would require, or even suggest a basis for, Texas courts to deviate from Supreme
Court precedent on this issue. Although the Texas Constitution is an "available"
tool to reject Supreme Court decisions with which we might disagree, we are not
free to impose our notions of fairness, nor those of dissenting Supreme Court
justices, upon Texas citizens as a matter of state constitutional law without firm
support in state history or policy. This Court's constitutional mandate is to uphold
and faithfully interpret the laws of this state, and not to create new constitutional
doctrines without solid jurisprudential foundation. That is not to say, of course,
that we cannot or will not construe our state constitution as providing rights which
the federal constitution does not provide, but rather that we should do so only
when unique aspects of Texas history, jurisprudence, or law support that separate
interpretation.

Id. at 267-68.
8. 456 U.S. 667 (1982).
9. The argument that the Texas constitutional double-jeopardy provision is a lesser shield
in the mistrial context has at least some plausible historical basis to it; I am unaware of any
historical basis for concluding that it is any greater. 
10. Bauder, 921 S.W.2d at 698.
11. The Bauder majority stated, inter alia: "But, unlike the Supreme Court, we do not
think the prosecutor's specific intent is a relevant aspect of the inquiry." 921 S.W.2d at 699. 
"[I]t seems to us that the prosecutor's specific intent . . . is irrelevant." Id. "In our view, putting
a defendant to this choice, even recklessly, is constitutionally indistinguishable from deliberately
forcing him to choose a mistrial." Id. "[W]e do not perceive a distinction of constitutional
significance between conduct of a prosecuting attorney in which he intends to cause a mistrial
and conduct of a prosecuting attorney which he is aware is reasonably certain to result in a
mistrial." Id. "In short, we do not believe that the purpose of the constitutional right here in
issue really has anything to do with the prosecutor's specific intent." Id. "As we see it, there is
no wisdom in a double jeopardy standard of decision which is at once difficult to apply and does
little to promote interests protected by the Double Jeopardy Clause." Id. (all emphasis added). 
In other words, we believe a majority of the United States Supreme Court justices got it wrong,
so we will not follow them.
12. Brown v. Allen, 344 U.S. 443, 540 (1953) (Jackson, J., concurring).
13. California v. Ramos, 463 U.S. 992, 1014 (1983).
14. For example, in one recent decision, Kelo v. City of New London, 125 S.Ct. 2655
(2005), the Supreme Court concluded that the federal constitution did not prohibit the City of
New London from exercising eminent domain over private property for the "public use" of a
new, privately owned waterfront development project. Id. at 2666-68. The Court, perhaps
anticipating the tsunami of impending criticism, noted,

 We emphasize that nothing in our opinion precludes any State from placing
further restrictions on its exercise of the takings power. Indeed, many States
already impose "public use" requirements that are stricter than the federal
baseline. Some of these requirements have been established as a matter of state
constitutional law, while others are expressed in state eminent domain statutes
that carefully limit the grounds upon which takings may be exercised. As the
submissions of the parties and their amici make clear, the necessity and wisdom of
using eminent domain to promote economic development are certainly matters of
legitimate public debate. This Court's authority, however, extends only to
determining whether the City's proposed condemnations are for a "public use"
within the meaning of the Fifth Amendment to the Federal Constitution. Because
over a century of our case law interpreting that provision dictates an affirmative
answer to that question, we may not grant petitioners the relief that they seek. 

Id. at 2668 (footnotes omitted). Although some citizens wailed and gnashed their teeth, decrying
the "wrongness" of the Court's decision, others took heed of the opinion itself and rushed right
out to debate and draft local legislation. According to the Wall Street Journal, eleven states
placed new property-rights initiatives on their November 7, 2006, ballots. WST.com, The Anti-Kelo Wave, Saturday, November 4, 2006, available at
http://www.opinionjournal.com/weekend/hottopic/?id=110009196 (last visited 01/09/2007)
(listing Arizona, California, Florida, Georgia, Idaho, Michigan, Nevada, New Hampshire, North
Dakota, Oregon, and South Carolina). The Wall Street Journal also noted, "Some 28 states have
already passed statutes that limit 'takings' powers, and five of Tuesday's 11 ballot measures were
crafted by state legislatures." Id. Kelo is a good example that when the citizens disapprove of a
specific Supreme Court holding that grants fewer or lesser constitutional rights than the citizens
deem appropriate, they certainly know what to do about it: pass a law or a new constitutional
amendment. No matter how "wrong" or "arbitrary" state judges may personally believe the
Supreme Court to be on a particular issue, they, like the rest of the nation's citizens, should
generally follow Supreme Court pronouncements on constitutional issues unless their state
constitutional provisions have an independent historical basis or their own citizens, through
legislation or the constitutional amendment process, evince a different balance of competing
rights and interests.

 Some commentators have suggested that, because of the relative ease with which state
constitutions can be amended by its citizens, state judges should feel free to exercise judicial
activism and they should expand state constitutional rights. See A.E. Dick Howard, State Courts
and Constitutional Rights in the Day of the Burger Court, 62 Va. L. Rev. 873, 939 (1976)
(pointing out that some judges believe that "the ease of amending state constitutions [is] a
justification for an activist position"); Utter, Freedom and Diversity in a Federal System:
Perspectives on State Constitutions and the Washington Declaration of Rights, Developments
in State Constitutional Law: The Williamsburg Conference 242 (B. McGraw ed. 1985)
(noting that "the relative ease of amending state constitutions reduces the risk of erroneous or
politically unacceptable constitutional lawmaking by state judges once it occurs"). This
argument, however, cuts both ways. If a state's citizens perceive the need for expanded
constitutional protection beyond that found in the federal constitution, they-the citizens-can
amend their constitution to provide those protections. That is the lesson of Kelo. As Chief
Justice John Marshall stated more than 150 years ago:

 Had the people of the several states, or any of them, required changes in their
constitutions; had they required additional safeguards to liberty from the
apprehended encroachments of their particular governments: the remedy was in
their own hand, and would have been applied by themselves. A convention could
have been assembled by the discontented state, and the required improvements
would have been made by itself.

Barron v. Mayor of Baltimore, 32 U.S. (7 Pt.) 243, 249 (1833). Of course, even easier, citizens
can ask their state legislatures to enact appropriately protective statutes as the need arises.
15. New State Ice Co. v. Liebmann, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting)
(emphasis added).
16. Kennedy v. Oregon, 456 U.S. 667, 673-74, 677-78 (1982).
17. Id. at 675 & n.5.
18. Id. at 677 n.7.
19. Id. 
20. See Majority Opinion at 51-60.
21. Malik v. State, 953 S.W.2d 234, 236 (Tex. Crim. App. 1997). Chief Justice Rehnquist
explained:

 Stare decisis is the preferred course because it promotes the evenhanded,
predictable, and consistent development of legal principles, fosters reliance on
judicial decisions, and contributes to the actual and perceived integrity of the
judicial process. Adhering to precedent "is usually the wise policy, because in
most matters it is more important that the applicable rule of law be settled than it
be settled right."

Payne v. Tennessee 501 U.S. 808, 827 (1991) (citations omitted).
22. Payne, 501 U.S. at 828 (internal quotations omitted).
23. Id.
24. Id. at 830.
25. 482 U.S. 496 (1987).
26. 490 U.S. 805 (1989).
27. Payne, 501 U.S. at 828-29.